Hon. Arnold F. Ciaccio Town Attorney, Irondequoit
This is in response to your letter wherein you state that an application has been made to select a site, pursuant to Mental Hygiene Law, §41.34, in the Town of Irondequoit for the establishment of a community residential facility for the disabled. You further state that the proposed site is an undeveloped empty lot located in a district zoned R-1 (Residential). Submitted with the site selection were architect plans for a building which would not conform with the neighborhood single family residential area. You ask whether the sponsoring agency which is making the application is bound by the customary zoning and building restrictions of the Town.
Section 41.34 of the Mental Hygiene Law, entitled "Site selection of community residential facilities," prescribes certain procedures for the establishment of community residences for the mentally disabled. The legislative findings and intent for this law were set forth in section 1 of the Laws of 1978, Chapter 468, and states in pertinent part:
 "* * * The legislature hereby finds and determines that mentally disabled individuals have the right to attain the benefits of normal residential surroundings * * * It is the intention of this legislation to meet the needs of the mentally disabled in New York state by providing, wherever possible, that such persons remain in normal community settings, receiving such treatment, care, rehabilitation and education, as may be appropriate to each individual. It is further intended that communication and cooperation between the various state agencies, local agencies and local communities be fostered by this legislation, and that this will be best achieved by establishment of clearly defined procedures for the selection of locations for community residences, to best protect the interests of the mentally disabled and ensure acceptance of community residences by local communities * * *" (Emphasis supplied.)
Prior to Chapter 468 of the Laws of 1978, there was no New York State statute dealing directly with site selection of community residences. Community residences were usually established in defiance of local officials and a great deal of litigation arose which served only to polarize the community without really settling the legal issues. (LivingResources v Burns, 91 Misc.2d 919 [S Ct, Albany County, 1977]; Connors vRetarded Children, 82 Misc.2d 861 [S Ct, Rensselaer County, 1975]; LittleNeck Assn. v W.O.R.C., 52 A.D.2d 90 [1976].) The trend was developing to allow the establishment of the residential facilities and to override all local laws and ordinances, at least to the extent that, in most instances, the local definition of "single family unit" would include "group homes." (City of White Plains v Ferraioli, 34 N.Y.2d 300 [1974];Little Neck Assn. v W.O.R.C., supra.)
In fact, although the Court of Appeals had avoided deciding the issue (Group House of Port Washington v Board of Zoning of North Hempstead,45 N.Y.2d 266 [1978]), several lower court cases went so far as to say that the State had preempted the field and the group homes could be established in total disregard of local laws and ordinances (Group Houseof Port Washington v Zoning Board of Appeals of North Hempstead,55 A.D.2d 636 [2d Dept, 1976], affd on narrower grounds, 45 N.Y.2d 266,supra; Abbott House v Village of Tarrytown, 34 A.D.2d 821 [2d Dept, 1970]; Nowack v Dept. of Audit and Control, 72 Misc.2d 518 [S Ct, Monroe County, 1973]).
It was in this legal climate that Chapter 468 of the Laws of 1978 was drafted. Its aim was twofold: first, to provide local input in the site selection process for the local governments to maintain the nature and character of the community; and, second, to discourage "frivolous legal challenges [and] * * * encourage a process of joint discussion and accommodation between the providers of care and services to the mentally disabled and representatives of the community, rather than legal antagonism" (Governor's Memorandum, McKinney's Session Laws, 1978, p 1821).
It is clear that, by enacting State legislation to govern the site selection process, the Legislature intended to preclude local legislation in that area. However, we do not believe that it was ever the intention to preempt all local involvement in the community residential facilities. Furthermore, Mental Hygiene Law, § 41.34(e), specifically states that "[a] community residence established pursuant to this section * * * shall be deemed a family unit, for the purposes oflocal laws and ordinances." (Emphasis supplied.)
A community residence, selected pursuant to section 41.34, will, therefore, be considered appropriate for a single family residential zone. It is our opinion, however, that local laws and ordinances which apply to single family residences will also apply to the community residences. This is in accord with Senator Frank Padavan, the main sponsor of the law. Recently, Senator Padavan issued a report wherein he attempts to explain how the law and selection process works. He states that:
 "Community residences which have been selected by this process must still comply with all of the local laws and ordinances governing single family dwellings." (Site Selection Of Community Residences For The Mentally Disabled: Historical Perspective And Legislation — April 1979, p 50.)
Accordingly, by reason of the foregoing, the sponsoring agency must still comply with the Town's zoning and building restrictions governing single family dwellings in order to establish a community residential facility pursuant to the procedures described in Mental Hygiene Law, §41.34.