**CITY OF VINITA PARK, a Municipal Corporation, By and Through its BOARD OF DIRECTORS, Plaintiff-Appellant,**

v.

**GIRLS SHELTERCARE, INC., a Corporation, and St. Louis County, Defendants-Respondents.**

No. 47094.

Missouri Court of Appeals, Eastern District, Division Two.

Jan. 10, 1984.

Marc S. Kramer, St. Louis, Alan J. Agathen, Clayton, for plaintiff-appellant.

Richard M. Marshall, Girls' Shelter Care, Inc., James H. White, Associate County Counselor, Clayton, for defendants-respondents.

PUDLOWSKI, Judge.

Appellant brought an action against respondents, alleging that the intended use of real property for a girls shelter care group home would violate the city's zoning ordinance, which restricts the property to single-family use, and its housing code, which prohibits occupancy of a dwelling unit by more than one family. Appellant appeals from the grant of a motion for summary judgment in favor of the respondents and the denial of appellant's motion for summary judgment. The issue on appeal is whether the appellant's zoning ordinances can prohibit a state agency's use and occupancy of real property located within the city as a girls shelter care group home operated and supervised by the Juvenile Court of St. Louis County.

Appellant is incorporated as a fourth class city under the laws of the State of Missouri and is located in St. Louis County, Missouri. Respondent Girls Shelter Care, Inc., (hereinafter G.S.C.) is a not-for-profit corporation organized under the laws of the State of Missouri. Its amended Articles of Incorporation states its purpose as follows: "To raise funds for and to purchase real property for the use of St. Louis County Juvenile Court as a Girls' Care facility or facilities and to own said facilities." Ordinance No. 10,952 of the County of St. Louis authorized a lease between St. Louis County and G.S.C. who owned a residence in Vinita Park. The property was leased for the use of the Juvenile Court of St. Louis County as a girls shelter care facility. The facility would consist of eight unrelated girls and three unrelated house parents. The property is zoned "A" residential single family under the zoning ordinance of appellant. The pertinent portions of zoning Ordinance No. 34 (1951), are as follows:

### Section 1

### Definition

For the purpose of this ordinance certain terms and words are herewith defined as follows:

.    .    .    .    .

DWELLING, ONE–FAMILY: a detached building designed for or occupied exclusively by one family.

.    .    .    .    .

FAMILY: One or more persons related by blood or marriage occupying a premises and living as a single housekeeping unit.

After the county council passed Ordinance 10,952, appellant filed a Petition for Permanent Injunction, Temporary Injunction, and Application for a Temporary Restraining Order. The next day, the trial court ordered respondents to show cause why such relief should not be granted. Complying with the order, both respondents filed separate answers and motions for summary judgment, accompanied by affidavits. Within days appellant also moved for summary judgment. The trial court granted respondents' motions for summary judgment, overruled appellant's motion, and denied appellant's petition for permanent injunction, etc. The trial court found "that the proposed use and occupancy of property in the City of Vinita Park under lease to St. Louis County as a girls shelter care group home operated by the Juvenile Court of St. Louis County is a governmental use expressly sanctioned and mandated by statute and the City of Vinita Park does not have the authority to prohibit such use." The court concluded that "regardless of the ownership of the property, its possession, use and occupancy will be solely for the Juvenile Court under authority of the lease to the County, and the City's ordinances cannot control indirectly, by application to Defendant Girls Shelter Care, Inc., what it is without power to restrict directly."

Appellant's motion for an injunction pending its appeal to this court was denied by the trial court.

This appeal follows. Appellant contends that the trial court erred in granting respondents' motions for summary judgment and in denying appellant's summary judgment motion because 1) the proposed use of the property in question would be in violation of appellant's zoning ordinance as it would permit the occupancy therein of more

than three unrelated individuals; 2) the property, if used as contemplated, would be subject to appellant's zoning code in that as a matter of law respondents would not enjoy governmental immunity to such code; and 3) respondents have not shown that they are entitled to judgment as a matter of law, in that there is no evidence in the record that it would be in the public interest to permit respondents to violate appellant's zoning code or that the conflicting provisions involved were most suitably harmonized by the court's ruling.

Before addressing the pivotal point, we will briefly address appellant's initial contention that "the trial court erred in granting respondent's motions for summary judgment and in denying appellant's such motion because the group home would be contrary to appellant's zoning (housing) ordinance as it permits the habitation of more than three unrelated individuals to reside in one dwelling."[1]

We recognize that the occupancy by eleven unrelated persons under the group home principle does not conform to the letter of either of the ordinances which defines family, but we do believe that it conforms to the spirit of the ordinances. The governing statute requires that the group home shall approximate a single family setting and shall provide access to community activities and resources. RSMo. § 211.021(6)(c) (Supp.1982). It was concluded in a recent commentary that most group homes, including the one in the instant case, are family style, community based and function as a single housekeeping unit, sharing responsibilities, meals and recreational activities. In order for the "family" to be as normal as possible it is essential that the home be integrated into a residential district, for that is the very type of atmosphere which it seeks to emulate.[2]

In *State ex rel. Ellis v. Liddle,* 520 S.W.2d 644 (Mo.App.1975), a case factually similar to ours, the court searched for the definition of "family". The court found that a group home, for ten juveniles and two surrogate parents, did no violence to the single family residence requirement and concluded that it was a family for such purposes. *Id.* at 651. The court described such a group home in the following way: "[The children] would attend public schools, have assigned work responsibilities, would earn points under a merit system and would function as a family-type group with the end goal of rehabilitation and integration into community life." *Id.* at 648. Similarly, in the instant case, the girls under the jurisdiction of the juvenile court would attend public schools, would not be confined, and would function as nearly as a family unit as is possible without being a "family" in the traditional sense or as defined in the pertinent ordinance.

The appellant cites *London v. Handicapped Facilities Bd., etc.,* 637 S.W.2d 212 (Mo.App.1982) in support of its argument that the group home fails to meet the definition of "family" embodied in the appellant's ordinance. This court held that where the term "family" was undefined in a restrictive covenant limiting a residence to "single-family" use, the intended meaning was to refer to two persons related by blood, marriage or adoption, thereby precluding the operation of a group home. That case, however, is clearly distinguishable on its facts. At issue in *London* was that the restrictive covenants created in the appellant property owner an interest in land used by a county board which, in use of the land, had unlawfully appropriated such property. In the instant case, the issue is whether a municipality can prohibit a statutorily authorized agency from oper-

1. Appellant inadvertently confuses the definition of family as set out in the zoning ordinance above and the definition of family as set out in the housing ordinance which defines family as an individual or married couple and the children thereof and no more than two other persons related directly to the individual or married couple by blood or marriage and not more than three persons not related by blood or

marriage living together as a single housekeeping unit in a dwelling unit.

2. See Comment, *Exclusionary Zoning and Its Effects On Group Homes in Areas for Single-Family Dwellings,* 24 U.Kan.L.Rev. 677, 680 (1976).

ating a group home within a restricted residential area. We note in *London* that this court recognized a property owner's rights are subordinate to the county's right of eminent domain and allowed the county time to pursue that action if it desired. *Id.* at 215.

The fact that a group home does constitute a "family" within the meaning of the law has been judicially approved by several courts. The New York Court of Appeals, in *City of White Plains v. Ferraioli*, 34 N.Y.2d 300, 357 N.Y.S.2d 449, 313 N.E.2d 756 (1974), upheld the right of a married couple caring for ten foster children to live in a district that the town sought to restrict to families of related individuals. The court stated that "[z]oning is intended to control types of housing and living and not the genetic or intimate internal family relations of human beings" and declared that an ordinance "neither by express provision nor construction may it limit the definition of family to exclude a household which in every but a biological sense is a single family." *Id.* at 305–306, 357 N.Y.S.2d at 452–453, 313 N.E.2d at 758–759.

A similar ordinance was at issue in *Group House of Port Washington, Inc. v. Board of Zoning and Appeals of Town of North Hempstead*, 45 N.Y.2d 266, 408 N.Y.S.2d 377, 380 N.E.2d 207 (1978). The "group home" was owned by a not-for-profit corporation and consisted of two surrogate parents and seven children. The court held that "the group home was the functional and factual equivalent of a natural family," and thus was permitted in an area zoned for single-family residence. *Id.* at 272, 408 N.Y.S.2d at 380, 380 N.E.2d at 209–210.

The appellant argues that the transient nature of the group home (average stay is three weeks or less) is at odds with the common perception of a "family". This argument is unconvincing. The surrogate family which the juvenile court hopes to create is in fact a permanent family structure, and not a temporary residence for transients. Although some of the resident children will be replaced by others as time passes, the family unit itself will continue.

*Id.* at 273, 408 N.Y.S.2d at 381, 380 N.E.2d at 211. We recognize the enthusiasm and hope of the juvenile authorities in being able to send those children home in three weeks but experience tells us that the family will be there for longer periods. Appellant's contention is meritless.

■ The pivotal issue is the appellant's next contention that the trial court erred in granting summary judgment because the property, if used as contemplated by respondents would be subject to appellant's zoning code and that respondents cannot enjoy governmental immunity to the code. The appellant's assumption is that it has the power through its ordinances to prohibit the use of leased property by a statutory governmental agency. This assumption is incorrect.

The Zoning Enabling Act, RSMo. § 89.010–89.140 (1978) constitutes the sole source of municipal zoning authority for cities, towns, and villages. *City of Kirkwood v. City of Sunset Hills*, 589 S.W.2d 31, 36 (Mo.App.1979) *citing Huttig v. City of Richmond Heights*, 372 S.W.2d 833, 838 (Mo. 1963). "A municipal corporation is a creature of the legislature possessing only those powers expressly granted, or those necessarily or fairly implied in or incidental to express grants, ... and any reasonable doubt as to whether a power has been delegated to a municipality is resolved in favor of non-delegation." *Kirkwood*, 589 S.W.2d at 35–36, *citing Anderson v. City of Olivette*, 518 S.W.2d 34, 39 (Mo.1975). Under RSMo. § 89.020 (1948), the zoning power is limited to "buildings, structures and land for trade, in industry, residence or other purposes." The terms "trade, industry, residence ..." all relate to property and the phrase "other purposes" has been construed by Missouri law as "not to extend the zoning power to restrict or limit the use of public property for public purposes." *Kirkwood*, 589 S.W.2d at 36 *citing State of Missouri ex rel. Askew v. Kopp*, 330 S.W.2d 882, 888 (Mo.1960); *State ex rel. St. Louis Union Trust Company v. Ferriss*, 304 S.W.2d 896, 900 (Mo. banc 1957).

Appellant's argument that the use of the property for a public purpose is not sufficient to immunize the land from zoning ordinances because it is privately owned by G.S.C., a non-for-profit corporation, is meritless. State government often conducts and operates some of its governmental functions through private, leased property, such as auto license offices, liquor control offices and "group homes" for neglected and abused children. Entities of this type usually operate on real property privately owned and leased by the state. Traditionally, where a state agency is immune from municipal zoning, those parties contracting to do the services which would otherwise be performed by the state have also been held to be immune. *See* 4 Rathkopf, *The Law of Zoning and Planning* § 53.04, 53–22 (Fourth Edition, 1983) and the authorities cited therein.

Moreover, the statutes of the State of Missouri require the county to provide for the juvenile court suitable facilities such as the group home at issue here. RSMo. § 211.151.1(2), (5) (Supp.1982) provides that the juvenile court may order detention of a child who is in temporary custody in a "shelter care facility" or in "such other suitable custody as the court may direct." The court is specifically directed by statute that such "abused or neglected child may not be detained in a temporary custody in a secure detention facility." RSMo. § 210.-125(5) (Supp.1982). "Shelter care" is defined by RSMo. § 211.021(6) (Supp.1982) as "the temporary care of juveniles in physically *unrestricting facilities* pending final court disposition." (emphasis added). This is precisely the proposed use of the girls shelter home as described in the affidavits of Juvenile Judge Melvyn W. Wiesman and Kenneth M. Hensiek, chief juvenile officer. The purpose of the home is to provide temporary home-like shelter and care for girls who do not need to be held in a locked detention setting and to provide an alternative to detention for those girls pending final court disposition.

The Missouri Supreme Court Rules of Practice and Procedure in Juvenile Courts Sup.Ct. Rule 111.03(a) (1983) also authorizes the court by order to specify the detention facilities to which juveniles shall be taken. The comment section states that the juvenile court's order "should distinguish between juveniles who are taken into custody because neglected or dependent and who represent no danger to themselves or others, and juveniles who require secure custody because of the existence of such danger." The girls who will be considered to be housed at the shelter care home fall within the former of those two categories. No girls considered to be dangerous or assaultive will be eligible. The girls will be victims of physical or sexual abuse or status offenders, such as incorrigibles, runaways, truants, curfew or minor misdemeanor violators.

Additionally, St. Louis County is mandated by statute to provide "facilities, upon request of the juvenile court, to provide proper services for the court in the diagnosis and treatment of children coming before it." RSMo. § 211.161(3) (Supp.1982). The county "is authorized to lease ... land for such purpose, and to erect buildings thereon and to provide funds to equip and maintain the same for the subsistence and education of the children placed therein." RSMo. § 211.331(4) (1978). RSMo. § 49.270 (1978) also provides that the county court "shall have power and authority to purchase, lease * * * any property, real or personal, for the use and benefit of the county." It necessarily follows that St. Louis County is clearly required by statute to provide group home facilities for the juvenile court and is authorized to lease and operate said facilities. These requirements cannot be abrogated or thwarted by the zoning ordinance of the City of Vinita Park.

Similar facts and principles were involved in *Abbott House v. Village of Tarrytown*, 34 App.Div. 821, 312 N.Y.S.2d 841 (1970). We agree with the court when it succinctly stated the appropriate principle:

It is clear that this Zoning Ordinance has the effect of totally thwarting the State's policy, as expressed in its Constitution and Social Service Law, of provid-

ing for neglected children. We are therefore of the opinion that the Tarrytown Zoning Ordinance, insofar as it conflicts and hinders an overriding State Law and policy favoring the care of neglected and abandoned children, is void as exceeding the authority vested in the Village of Tarrytown. Id. at 843.

The limited power of a municipality to zone public uses has been addressed in several other Missouri cases. In *State ex rel. St. Louis Union Trust Co. v. Ferriss*, 304 S.W.2d 896 (Mo.1957), the City of Ladue through its zoning power sought to prohibit the Ladue school district from acquiring land and constructing a school building on land in the City of Ladue. The court held that where the constitution and statutes vested the power to locate and construct a school, the city had no authority to prohibit the exercise of such power by its zoning ordinance. The court stated:

> The only instance coming to our attention wherein the courts have permitted a municipality to control the location of a public institution through zoning ordinances are cases where the court found that the public agency in conducting such enterprise would be engaged in a proprietary rather than governmental function. *Id.* at 902.

A use is governmental if created pursuant to a duty imposed on a state to provide for the general welfare of its citizens. 2 Rathkopf, *The Law of Zoning & Planning* § 17A.05, 17A–30 (Fourth Edition, 1983). In the instant case the leasing of the premises pursuant to the statutory authority for the county and juvenile court to establish a group home is a governmental function (use) and thereby immune from the City of Vinita Park's zoning ordinance.[3]

*Appelbaum v. St. Louis County,* 451 S.W.2d 107 (Mo.1970) establishes that St. Louis County can be immune from municipal regulation by zoning ordinances. In

that case, St. Louis County's construction of an incinerator and landfill on land within the villages of St. John and Belridge was permitted despite the existence of zoning ordinances which prohibited such facilities. The court held that St. Louis County had the authority by statute and charter to acquire land and construct the incinerator and thus was not subject to the zoning ordinances of the municipalities within the county.

In *Kirkwood,* 589 S.W.2d at 31, this court held that the power of Kirkwood delegated to it by statute could not be abrogated by the zoning ordinance of the neighboring city of Sunset Hills. Judge Kelly, after reviewing earlier Missouri cases where the power of a municipality to zone public uses was at issue (*Union Electric Company v. City of Crestwood,* 499 S.W.2d 480 (Mo. 1973), *Appelbaum, St. Louis County v. City of Manchester,* 360 S.W.2d 638 (Mo. banc 1962), *St. Louis Union Trust Co.*), concluded:

> The common thread which runs through each of these cases appears to be the holding that where a power has its source in the Constitution, although delegated by the state legislature to a municipality or other state agency, it takes precedence over and cannot be restricted by a power, such as zoning, which is delegated to a competing municipality or governmental agency without any constitutional source. 589 S.W.2d at 42.

Appellant cites *St. Louis County v. City of Manchester,* 360 S.W.2d 638, in support of its contention that St. Louis County can be restricted by a zoning ordinance of a municipality. That case does not support this proposition because the facts are clearly distinguishable from the case at bar. In *Manchester* the zoning ordinances of St. Louis County, a charter county, were held to be lawful restrictions upon the location of a sewage disposal plant by a fourth class city in the unincorporated area of St. Louis

---

**3.** See also, *State ex rel. Askew v. Kopp,* 330 S.W.2d 882, 888 (Mo.1960) and *State ex rel. City of Gower v. Gee,* 573 S.W.2d 107, 112 (Mo.App.1978), which hold that sewage disposal facilities could be constructed by a munici-

pality by state statute, notwithstanding the fact that the construction of the facilities violated the zoning ordinances of the counties in which they were to be constructed.

County. *Id.* It is recognized that the key to the *Manchester* decision was the county's constitutional authority to enact zoning ordinances. *Kirkwood,* 589 S.W.2d at 39–40, 42. The zoning authority prevailed in *Manchester* because the source of the zoning power was the constitutional power rather than the limited power granted in RSMo. § 89.020 (1978). *Id.* at 641.

Appellant is not a constitutional charter municipality, and cannot avail itself of the *Manchester* rationale. The three cases cited by the appellant under this point are from one foreign jurisdiction, are distinguishable and do not support a contrary result.

Appellant's third point contends that the trial court erred in that there is no evidence in the record that it would be in the public interest to permit the respondents to violate appellant's zoning code or that the conflicting provisions involved were most suitably harmonized by the court's ruling. The appellant, as we view its point, is urging this court to adopt the so-called "balancing of interests" test to resolve this intergovernmental conflict. Clearly, appellant has ignored Judge Kelly's comment that this test has not been adopted in Missouri. *Kirkwood,* 589 S.W.2d at 43. Assuming such a test were to be applied to these facts, there could be little doubt that the appellant's ordinances must yield to the overriding policy and statutory obligation to establish shelter care group homes for the care of neglected or abandoned children.

Judgment affirmed.

CRIST, P.J., and SIMON, J., concur.